UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
Violet Coleman-Edwards,                                  :
                                                         :
                          Plaintiff,                     :          **<u>MEMORANDUM AND ORDER</u>**
                                                         :
                 -against-                               :          03-CV-3779 (DLI) (VVP)
                                                         :
Gary V. Simpson, Concord Baptist Church of               :
Christ, Board of Directors of the Concord Baptist        :
Church of Christ, and the United States Department :
of Education,                                            :
                                                         :
                          Defendants.                    :
-----------------------------------------------------------------x
**DORA L. IRIZARRY, U.S. District Judge:**

Violet Coleman-Edwards ("plaintiff") is the former principal of the Concord Baptist

Elementary School (the "School"), which is operated by defendant, the Concord Baptist Church

of Christ ("Concord"). Defendant Reverend Gary V. Simpson is Concord's senior pastor.

Plaintiff claims that defendants: (1) denied her overtime wages in violation of the Fair Labor

Standards Act ("FLSA"); (2) failed to notify her of her right to continuing medical coverage in

violation of the Consolidated Ominbus Reconciliation Act ("COBRA"); (3) failed to publish a

summary plan description of its employee benefits pension plan, notify eligible participants, and

segregate assets in violation of the Employee Retirement Income Security Act ("ERISA"); and

(4) breached her employment contract. In a decision dated September 27, 2005, the court

dismissed plaintiff's contract claim on summary judgment. *Coleman-Edwards v. Simpson*, 03-

CV-3779, 2005 WL 2367628 (E.D.N.Y. Sept. 27, 2005). Defendants now move, and plaintiff

cross-moves, for summary judgment on plaintiff's remaining statutory claims. For the reasons

set forth below, defendants' motion is granted, plaintiff's motion is denied, and plaintiff's

remaining claims are dismissed.

# I.    Background

On November 8, 1847, the Concord Street Baptist Church of Christ was incorporated in Kings County as a church under the laws of New York State.  (Johnson Aff., Ex. 1.)  On January 12, 1928, defendant Concord dropped the "Street" from its name and acquired its present nomenclature, the Concord Baptist Church of Christ.  (*Id*.)  Concord is a member of the American Baptist Churches of Metropolitan New York ("ABC"), and possesses 501(c)(3) tax exempt status under ABC's group exemption.  (Simpson Aff., Ex. 2.)  The Concord Baptist Elementary School is an unincorporated private elementary school operated and controlled by Concord.  (Simpson Dep. 23.)

## A.    Plaintiff's Tenure as Principal of the School

From September 1999 until December 2002, Concord employed plaintiff as the School's principal.  Plaintiff holds a bachelor's degree in English from Wilberforce University, and masters' degrees in English from both New York University and Columbia University.  (Pl. Dep. 6.)  At the time of filing, plaintiff was also pursuing a doctorate in English from St. John's University.  (*Id*.)  Plaintiff is certified by New York City to teach grades one through twelve, and is also certified by the city and state in administration, having completed the course work for a degree in administration.  (*Id*. at 7-8.)  Prior to becoming the School's principal, plaintiff coordinated the gifted and talented program at a public intermediate school in Brooklyn.  (*Id*. at 9.)  Plaintiff highlighted her certifications and educational accomplishments when she applied for the position with Concord.  (*Id*. at 23.)

On September 6, 2002, plaintiff entered into a contract with Concord to serve as the School's principal for one year and be paid a salary of $50,000.  (Johnson Aff., Ex. 6.)  The contract described plaintiff's duties as follows:

As the educational leader in [the School], the Principal is expected to:

- Provide adequate leadership, supervision and instruction to the staff in the carrying out of their duties.
- Insure the school is in compliance with all Federal, State and New York City Board of Education requirements for operation and testing.
- Assume responsibility for fiscal integrity of the school as outlined in an approved budget.
- Provide sufficient information to Senior Pastor of status and progress of the school during the academic year.
- Work with Senior Pastor to [] integrate the work [of the School] into the overarching vision and program of the Concord Baptist Church of Christ. This will be accomplished by regular meetings with Senior Pastor.
- Insure the sustainability of the school through recruitment of the class for the following academic year.
- Submit annual Report to Senior Pastor of Academic Year by 30 June 2003.

(*Id*.) Plaintiff stated in her deposition that she performed all of the duties listed in the contract. (Pl. Dep. 115.) In her own words, plaintiff understood that her job as principal was "to facilitate the learning, to validate, justify the curriculum, making sure that it was in line with the requirements of New York City and New York State, provide curriculum support and direction for the staff, create a schedule for the school, facilitate contact with resources, increase student enrollment, [and] develop a program that could meet the needs of the parents in the school where the children were." (*Id*. at 29.)

The contract also described a uniform policy applicable to all the School's employees. Specifically, the contract provided that "[u]niforms are a part of our employment expectations for staff members," and that "[e]mployees not in proper attire while on duty will be docked." (Johnson Aff., Ex. 6.) Plaintiff's payroll records indicate that $200 deducted from her $2.083.33 bi-weekly paycheck dated October 31, 2002, and that $100 was deducted from plaintiff's final paycheck of approximately $416 dated December 31, 2002, although the reasons for the deductions are not apparent. (Ziermann Aff., Ex. 1.)

Supervision and interaction with the teaching staff made up a significant portion of plaintiff's responsibilities. Plaintiff's contract required her to conduct staff development meetings on a variety of topics, and gave her discretion to determine how frequently such meetings should be held. (*Id*. at 26-28.) In practice, plaintiff held weekly meetings, some of which she led herself, while others were led by various staff members. (*Id*. at 32.) Plaintiff used these meetings to examine the academic strengths and weaknesses of the School's students, and to help the teachers shape their lesson plans accordingly. (*Id*. at 27.) In order to gauge the students' abilities, plaintiff began testing the students with the Stanford Achievement Test, which she favored in lieu of the state and city tests that the School had used prior to her arrival. (*Id*. at 24-25.) In addition to attendance at the staff development meetings, plaintiff required the teachers to submit weekly lesson plans, which plaintiff reviewed. (*Id*. at 46.) If plaintiff thought it necessary, she would revise the lesson plan and meet with the responsible teacher to discuss the revisions. (*Id*. at 47-48.) Plaintiff also created schedules that determined when each teacher would be responsible for supervising the student lunch period. (*Id*. at 61.) By contract, teachers were expected to notify plaintiff of any expected or emergency absences so that plaintiff could make the necessary preparations. (Johnson Aff., Ex. 6.)

Plaintiff was also involved in hiring and retaining teachers, although Reverend Simpson had the final say on all employment decisions. Plaintiff interviewed candidates for teaching positions, and made hiring recommendations to Reverend Simpson. (Pl. Dep. 56-60.) On at least one occasion, plaintiff recommended, and Reverend Simpson agreed, that a certain teacher should be fired for failing to perform at the expected level. (*Id*. at 96-98.) Plaintiff gave the teachers either a verbal or written evaluation at the end of each school term. (*Id*. at 74-77.) In making her evaluations, plaintiff considered a variety of factors and made an assessment based

on "seeing the teachers in every aspect of their job." (*Id*. at 80-81.) These evaluations were used to help determine teacher salaries, which were set officially by Reverend Simpson. (Johnson Aff., Ex. 6.)

In addition to supervising the School's teachers and current students, plaintiff sought to increase the School's enrollment by "creat[ing] liaisons between [her]self, daycare, and elementary schools in the area." (Pl. Dep. 81.) Using a directory that she obtained from a friend, plaintiff contacted and arranged meetings with representatives from various Head Start, pre-k, and kindergarten programs in the area. (*Id*. at 84.) Plaintiff met with parents, teachers, and admissions personnel and distributed informational packets about the School. (*Id*.) On several Saturday mornings throughout the year, Concord tested students who were interested in attending the School. (*Id*. at 115-120.) While these tests were being administered, plaintiff held information sessions about the School for the interested students' parents. (*Id*.) The tests used at these sessions were developed by plaintiff and the teachers at their weekly staff development meetings. (*Id*.)

Plaintiff's duties as principal also entailed a myriad of other responsibilities. During the 2000-01 school year, plaintiff supervised the custodial staff and helped develop a system to keep the custodians apprised of requests to use the School's facilities for various events and functions. (*Id*. at 90-91.) In advance of the 2001-02 school year, plaintiff prepared a proposed budget and submitted it to Reverend Simpson for his approval. (*Id*. at 95.) Although she needed Reverend Simpson's authorization to spend Church money on supplies for the School, plaintiff occasionally bought certain supplies herself because it "wasn't always possible [to get Reverend Simpson's prior approval] in order for things to get done for the running of the school and the best interest of the children." (*Id*. at 72, 79.) Plaintiff communicated with parents when she

thought it necessary to clarify certain issues. (*Id*. at 94.) Throughout her time as principal, plaintiff also regularly instructed students at the School in the core subject areas of English, social studies, math, and science. (*Id*. at 74.) Plaintiff stated that although she would have liked to meet with Reverend Simpson regularly to discuss the School, in practice, the two met very infrequently. (*Id*. at 102.)

B.    Plaintiff's Health Care Plan

Plaintiff's employment contract gave plaintiff the option, which she accepted, of enrolling in Concord's health plan, under which Concord would pay half of plaintiff's premium for an individual plan, and plaintiff would pay the remainder as a deduction from her paycheck. (Johnson Aff., Ex. 6.) Concord's health insurance carrier was HIP Health Plan of New York ("HIP"), and the monthly cost of coverage at the time of plaintiff's contract was $261.50. (Johnson Aff., Ex. 6.) In his deposition, Reverend Simpson confirmed that Concord made HIP health insurance coverage available to all of its employees, and that the cost of coverage was divided between Concord and the individual employees. (Simpson Dep. 57-58.)[1]

C.    Concord's Pension Plan

Concord, as a member of ABC, makes a pension plan available to its ordained ministers through the Ministers and Missionaries Benefit Board ("MMBB"), and submits payment to MMBB on the ministers' behalf. (Simpson Dep. 55-57.) At no time was plaintiff allowed to participate in this benefit. (*Id*.; Pl. Dep. 109-10.) Frank O'Brien, the Director of Compliance at MMBB, stated in a sworn affidavit that Concord submits payments on behalf of Reverend

---

[1] Plaintiff claims that a June 15, 2007 letter from Herbert L. Marche, the director of HIP's commercial billing department, attached to Reverend Simpson's affidavit is inadmissible because it is neither sworn nor certified as required by Rule 56(e) of the Federal Rules of Civil Procedure. (*See* Simpson Aff., Ex. 1.) The court need not consider this letter nor plaintiff's objections to it, however, as the letter merely confirms that Concord established and maintained a health plan for its employees through HIP—an undisputed fact that is established by ample other evidence in the record. With regard to plaintiff's argument that the affidavits of Frank O'Brien and Ann Ziermann are also inadequate, the court finds that these affidavits and the documents attached to them comply with Rule 56(e).

Simpson and an associate pastor for participation in pension plan that was established and maintained by MMBB as a "church plan," as that term is described and exempted by ERISA. (O'Brien Aff. 1-2.)  The affidavit further states that MMBB is a tax exempt organization, and that it has not elected, pursuant to section 410(d) of the Internal Revenue Code, to be subject to ERISA.  (*Id*. at 2.)

D.     Reverend Simpson's Involvement with the School

At all times relevant to this dispute, Reverend Gary V. Simpson was Concord's senior pastor.  (Simpson Dep. 6.)  As such, Reverend Simpson was the "head of staff" for all Concord employees, responsible for making sure Concord was properly staffed and that its bills were being paid.  (*Id*. at 7.)  Reverend Simpson oversaw the management of the School, and was responsible for hiring educators who would handle the day-to-day administration of the school and do "whatever it would take . . . to operate a school and have it in compliance with both federal and state education rules and regulations."  (*Id*. at 9-10.)  According to Reverend Simpson, plaintiff had the primary responsibility to decide which teachers should be hired or fired, and had a degree of discretion to determine the salaries that teachers should be paid.  (*Id*. at 11.)  As the School was not a distinct entity, its finances, along with all of Concord's other expenses, were controlled by Concord's trustee board.  (*Id*. at 16-17, 23.)

A number of times throughout plaintiff's tenure as principal, Reverend Simpson communicated with plaintiff by writing memos.  On one occasion, Reverend Simpson wrote plaintiff a memo because she missed work to attend her daughter's graduation.  (Simpson Dep. 75.)  Plaintiff claims that Reverend Simpson docked her pay as punishment for this absence. (Coleman-Edwards Aff. ¶ 3.)  Reverend Simpson also wrote plaintiff memos, entitled "Pastor's Reflections" at the conclusion of the 1999-2000 and the 2000-01 school years.  (*Id*. at Ex. D.)

One issue stressed in both memos was the requirement that all teachers and staff wear uniforms to work or have their salaries docked. (*Id.*) The 1999-2000 memo states that there were "no exceptions" to this policy, and the 2000-01 memo specifically states that the policy applied to plaintiff. (*Id.*) The latter continues, "My note last year spoke of docking pay. I must become more insistent on this." (*Id.*) Reverend Simpson stated in his deposition that this policy was directed primarily at the teaching staff, and that he did not require plaintiff to wear the typical uniform, which included a skirt, because plaintiff suffered from a disfiguring leg injury. (Simpson Dep. 81.) Instead, Reverend Simpson expected plaintiff to wear dark suits. (*Id.*)

The "Pastor's Reflections" memos also express a number of Reverend Simpson's other concerns, suggestions, and hopes for plaintiff's leadership of the School. (Coleman-Edwards Aff., Ex. D.) In the 1999-2000 memo, for example, Reverend Simpson offered some suggestions for how plaintiff could improve the School's graduation ceremony in the upcoming year. (*Id.*) In the 2000-01 memo, Reverend Simpson suggested that the letters plaintiff sent to students' parents should be shortened. (*Id.*) Also in that memo, Reverend Simpson chastised plaintiff for leaving the School one on occasion before the students had returned from a field trip. (*Id.*) Apart from these few specific issues, however, Reverend Simpson's "Reflections" did not recommend specific action on plaintiff's part, but instead offered more general guidance on what goals Reverend Simpson would like the School to achieve, and the extent to which plaintiff was helping to achieve those goals. (*Id.*)

E.      Plaintiff's Termination as Principal

Plaintiff was terminated following an incident that occurred in November or December of 2002, in which she instructed a male teacher to inspect the underwear of five male students for signs of feces. (Johnson Aff., Ex. 8 at 1.) Plaintiff was attempting to find out which student had

defecated on the floor of the boys' bathroom and smeared feces on the bathroom walls. (*Id*.) The incident was the fifth time in recent weeks that someone had smeared feces on the floor and walls of a bathroom in the School. (*Id*.) Following the inspection, which successfully identified the responsible student, several students alleged that they had been touched inappropriately, or felt violated, by the teacher who conducted the search. (*Id*. at 1-3.) In a December 17, 2002 letter to Reverend Simpson, plaintiff admitted that she had not handled the situation appropriately, and that her "judgment was poor and solely based on the upgraded frequency with which [the bathroom incidents] had begun to occur; three times in six or seven days and randomly throughout the building." (*Id*.) Plaintiff also stated in the letter that she expected to be reprimanded by Reverend Simpson. (*Id*. at 4.)

After investigating the incident, Reverend Simpson concluded that a reprimand would not suffice, and that plaintiff needed to be discharged as the School's principal. (Simpson Dep. 40-42.) He met with plaintiff on December 30, 2002 and informed her that she was going to be fired because she had failed to adequately supervise the male teacher who inspected the students' underwear. (*Id*. at 42; Coleman-Edwards Aff., Ex. H.) The next day, Reverend Simpson wrote a letter to plaintiff confirming that she was being terminated as principal "due to failure to meet administrative expectations." (Coleman-Edwards Aff., Ex. H.)

## II.     Discussion

### A.     Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a

'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1988)).

B.  Plaintiff's FLSA Claim

Plaintiff claims that Concord and Reverend Simpson violated her rights under the FLSA by failing to compensate her for the hours that she worked in excess of forty hours per week. Defendants contend they are entitled to summary judgment on this claim because plaintiff, as principal of an elementary school, was an administrative employee and therefore exempted from the FLSA's provisions pursuant to 29 U.S.C. § 213(a)(1) and 29 C.F.R. § 541.204. The FLSA's overtime provision requires employers to pay an increased rate to their employees who work more than forty hours in a given week. 29 U.S.C. § 207. The statute, however, exempts from this provision "any employee employed in a bona fide executive, administrative, or professional

capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools)." 29 U.S.C. § 213(a)(1).

The Secretary of Labor—whose regulations are to be given controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute—defines "employee employed in a bona fide administrative capacity" to include employees "[c]ompensated for services on a salary or fee basis at a rate of not less than $455 per week" and "[w]hose primary duty is performing administrative functions directly related to academic instruction or training in an educational establishment or department or subdivision thereof." 29 C.F.R. § 541.204(a); *see Freeman v. Nat'l Broad. Co.*, 80 F.3d 78, 82 (2d Cir. 1996) (citing *Chevron v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)). In other words, "an employee qualifies for the exemption if the employee is paid on a 'salary basis' *and* satisfies a 'duties' test." *Bongat v. Fairview Nursing Care Center, Inc.*, 341 F. Supp. 2d 181, 184 (E.D.N.Y. 2004) (citing *Kelly v. City of Mount Vernon,* 162 F.3d 765, 766 (2d Cir. 1998); 29 C.F.R. §§ 541.1-541.3). Because the FLSA is a remedial statute, courts construe exemptions narrowly and the employer bears the burden of showing that an employee "plainly and unmistakably" fits within the applicable exemption. *Id.* (quoting *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960)).

### 1. The Salary Basis Test

In order to be compensated on a salary basis, an employee must be paid "a predetermined amount" that is "not subject to reduction because of variations in the quality or quantity of the work performed." *Kahn v. Superior Chicken & Ribs, Inc.*, 331 F. Supp. 2d 115, 117 (E.D.N.Y. 2004) (citing 29 C.F.R. § 541.118(a)). In *Martin v. Malcolm Pirnie, Inc.*, the Second Circuit explained that "[g]enerally, an employer that maintains the discretion to reduce an employee's compensation as a result of the employee's hours or the quality of the employee's work, may not

consider the employee to be paid on a salary basis." 949 F.2d 611, 615 (2d Cir. 1991). In *Auer v. Robbins*, however, the Supreme Court clarified that an employee's salary is subject to reduction only when "there is either an actual practice of making [pay] deductions or an employment policy that creates a 'significant likelihood' of [pay] deductions." 519 U.S. 452, 461 (1997).

Plaintiff contracted with Concord to serve as principal of the School in exchange for an annual salary of $50,000, which exceeds the $455 per week threshold set forth in the regulations. *See* 29 C.F.R. § 541.204(a). Plaintiff argues, however, that her salary was subject to reduction because Reverend Simpson docked her pay when she missed work to attend her daughter's graduation, and because he threatened to dock her pay for failing to comply with the School's uniform policy. It is unclear from the record the dates or the length of time that plaintiff was absent when she attended her daughter's graduation, but plaintiff's payroll records indicate that on October 31, 2002, a deduction of $200 was made from her bi-weekly paycheck of $2,083.33, and that on December 31, 2002, a deduction of $100 was made from her final bi-weekly paycheck of approximately $416.

Although an employer may dock the salary of an exempt employee who misses a full day of work for personal reasons, 29 C.F.R. § 541.602(b)(1), an employer generally may not dock the salary of an exempt employee who misses only a fraction of a workday, *Bongat*, 341 F. Supp. 2d at 185 (citing *Whitmore v. Port Authority of New York & New Jersey,* 907 F.2d 20, 21 (2d Cir. 1990)). It would be reasonable to assume that a $200 deduction from an approximately $2,000 bi-weekly paycheck corresponds to a one-day absence, i.e., one tenth of a ten-workday pay period, in which case the deduction would have no bearing on plaintiff's status as an exempt employee. Viewing the evidence in the light most favorable to plaintiff, however, the court will

assume that plaintiff's salary was in fact docked for missing only a portion of a workday. Accordingly, the court must determine whether an isolated salary deduction for a partial-day absence, combined with the other threatened deductions, created a significant likelihood of pay deductions or constituted an actual practice of making such deductions.

A significant likelihood of pay deductions exists where there is "a clear and particularized policy—one which effectively communicates that deductions *will be* made in specified circumstances." *Yourman v. Giuliani*, 229 F.3d 124, 129 (2d Cir. 2000) (quoting *Ahern v. County of Nassau*, 118 F.3d 118, 121 (2d Cir. 1997) (internal quotation marks omitted)). Nothing in the record indicates that defendants informed plaintiff of a policy under which she would be penalized for missing a portion of a workday for personal reasons. If such a policy did in fact exist, its only apparent manifestation was the lone instance in which defendants, without warning, docked plaintiff's salary. Engaging in post-hoc analysis to divine a policy of pay deductions would be inconsistent with the clarity that *Auer* requires. *See Kelly*, 162 F.3d at 770 (finding no significant likelihood of pay deductions because there was "no written policy" stating that deductions would be made in specified circumstances). Accordingly, the court finds that this lone instance of disciplinary salary docking is insufficient to establish an employment policy creating a significant likelihood of pay deductions.

Although presenting a somewhat closer question, the uniform policy articulated in plaintiff's employment contract and in the "Pastor's Reflections" memos also failed to create a significant likelihood of pay deductions. The contract provided that "[u]niforms are a part of our employment expectations for staff members," and that "[e]mployees not in proper attire while on duty will be docked." (Johnson Aff., Ex. 6.) In a similar vein, Reverend Simpson's 1999-2000 end-of-term memo noted that "[t]eachers and staff who do not comply [with the uniform policy]

will have to be docked in their pay. No exception." (Coleman-Edwards Aff., Ex. D.) Likewise, the 2000-01 memo reiterated the threat, specifically noted that the policy applied to plaintiff, and stated: "My note last year spoke of docking pay. I must become more insistent on this." (*Id.*) In his deposition, however, Reverend Simpson stated that the uniform policy was directed primarily at the teaching staff, and was relaxed somewhat in regards to plaintiff because she suffered from a disability that made wearing the uniform impractical. (Simpson Dep. 79-82.)

Regardless of whether these threats of salary deductions were directed at plaintiff, nothing in the record indicates that plaintiff's salary, or that of anyone else's, was ever docked as punishment for failing to wear a uniform. Although the terms of plaintiff's employment appear to make salary docking a permissible punishment for violating the School's uniform policy, plaintiff fails to demonstrate that pay deductions "would in fact be made" if she failed to comply with the policy. *See Yourman*, 229 F.3d at 129. Accordingly, the School's employment policies did not create a significant likelihood of deductions to plaintiff's pay. *Id.* (finding no significant likelihood of deductions to the salaries of managerial employees even though employers admitted that such employees were subject to disciplinary deductions "and that, at least in rare instances, such deductions were made."); *Ahern*, 118 F.3d at 121-22 (Although the plaintiffs "definitively showed that their employment manual stated that the relevant deductions could be made from the salaries of employees in their class . . . , [they] could not point to any rule that stated that if they committed a specific infraction, their pay would be docked. And this is what we read *Auer* to require.").

Plaintiff's salary would still have been subject to reduction, however, if the School had an actual practice of making pay deductions. Determining what constitutes an "actual practice" of deducting pay requires the court to discern whether the employer objectively intended to pay its

employees on a salaried basis. *Yourman*, 229 F.3d at 130. This analysis requires consideration of a number of factors, including the actual number of salary deductions, "the number of times that other forms of discipline are imposed, the number of employee infractions warranting discipline, the existence of policies favoring or disfavoring pay deductions, the process by which sanctions are determined, and the degree of discretion held by the disciplining authority." *Id*.

In the present case, plaintiff alleges only one instance of disciplinary salary docking during her tenure as principal, which occurred after she missed work to attend her daughter's graduation.[2] As far as the court can determine, the only other time that Reverend Simpson disciplined plaintiff was when he suspended her without pay, and then discharged her as principal, in the wake of the 2002 bathroom incident. Judging from the "Pastor's Reflections" memos, Reverend Simpson believed that plaintiff had committed other infractions, but those infractions were not punished by salary deductions. Specifically, the 2000-01 memo discussed an incident in which plaintiff left school before students returned from a field trip, and both memos mention Reverend Simpson's disappointment that teachers and staff—including plaintiff—were not complying with the uniform policy. The court finds that these factors from *Yourman* weigh against finding an actual practice of pay deductions. And although Reverend Simpson seems to have had considerable discretion to determine whether any sanction should be imposed, the court affords great weight to the fact that defendants punitively docked plaintiff's salary in only one isolated instance. *See Auer*, 519 U.S. at 461-62 (one-time disciplinary pay deduction did not render salary subject to reduction); *Ahern*, 118 F.3d at 121 (one deduction

---

[2] Plaintiff notes that one pay period is missing from the records submitted by defendant, and asks the court to infer that defendants intentionally omitted the pay stub from this period because it evidenced another disciplinary salary deduction. The court finds such an inference unwarranted. Plaintiff had ample time to explore this issue during discovery, yet she fails to point to any fact in the record suggesting that other disciplinary deductions were made. Likewise, plaintiff has suggested that the $100 deduction in plaintiff's final paycheck was made for disciplinary reasons. No facts in the record support this allegation, and in any event, the existence of two isolated incidents of disciplinary salary docking, as opposed to one, would not alter the court's analysis.

insufficient to establish actual practice); *see also O'Brien v. Town of Agawam*, 350 F.3d 279, 294 (1st Cir. 2003) (four isolated pay deductions insufficient to show actual practice); *Aiken v. City of Memphis,* 190 F.3d 753, 762 (6th Cir.1999) (one deduction insufficient); *Childers v. City of Eugene*, 120 F.3d 944, 947 (9th Cir. 1997) (one deduction insufficient). Accordingly, no genuine issue of material fact precludes the court from finding that plaintiff was paid a predetermined salary that was not subject to reduction.

2.     *The Duties Test*

Plaintiff also claims that although she held the title of "principal," Reverend Simpson did not allow her to exercise the duties normally associated with that position, and for that reason, she was not an exempt administrative employee. The Secretary of Labor's regulations provide that an "employee employed in a bona fide administrative capacity" is one "[w]hose primary duty is performing administrative functions directly related to academic instruction or training in an educational establishment or department or subdivision thereof." 29 C.F.R. § 541.204(a). Neither party disputes that the School is an "educational establishment" within the meaning of the regulations. *See* 29 U.S.C. § 203(v); 29 C.F.R. § 541.204(b). The question thus becomes whether plaintiff "perform[ed] administrative functions directly related to academic instruction or training." Such functions are defined as "work related to the academic operations and functions in a school rather than to administration along the lines of general business operations." 29 C.F.R. § 541.204(c). Employees engaged in such functions include:

> [T]he superintendent or other head of an elementary or secondary school system, and any assistants, responsible for administration of such matters as curriculum, quality and methods of instructing, measuring and testing the learning potential and achievement of students, establishing and maintaining academic and grading standards, and other aspects of the teaching program; *the principal and any vice-principals responsible for the operation of an elementary or secondary school*; department heads in institutions of higher education responsible for the administration of the mathematics department, the English department, the

16

foreign language department, etc.; academic counselors who perform work such as administering school testing programs, assisting students with academic problems and advising students concerning degree requirements; and other employees with similar responsibilities.

*Id*. at § 541.204(c)(1) (emphasis added).

Furthermore, "[t]o qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). Exercising discretion and independent judgment involves acting or making a decision by choosing one possible course of action after other options have been compared and evaluated. *Id*. An employee may exercise discretion and independent judgment even if they make recommendations for action instead of taking direct action and even if their recommendations or decisions are reviewed, and even reversed, at a higher level. *Id*. at § 541.202(c). The exercise of independent judgment and discretion does, however, imply that the employee is authorized to make independent choices "free from immediate direction or supervision." *Id*. Finally, it is important to note that the regulations require only that an employee's duties *include* the exercise of discretion, not that they consist entirely of the exercise of such discretion. 69 Fed. Reg. 22,122, 22,142-43 (Apr. 23, 2004) (noting that current section 541.202(a)'s "requirement that the primary duty must 'include' the exercise of discretion and independent judgment—rather than 'customarily and regularly' exercise discretion and independent judgment—is not a change from [prior] law.").

Despite plaintiff's attempt to portray herself merely as the "titular head" of the School, the evidentiary record demonstrates that she exercised independent discretion, and that she performed the full range of duties expected of a principal of an elementary school. Upon arriving at the School, plaintiff chose to use the Stanford Achievement Test because she felt the state and city tests being used by the School were insufficient indicators of student ability.

Plaintiff used the results of these tests to determine which subject areas teachers needed to focus on, and she worked closely with teachers to develop their lesson plans accordingly. Plaintiff interviewed and supervised teachers and made hiring and firing recommendations to Reverend Simpson. Plaintiff developed a recruitment strategy to increase the School's enrollment, and she visited kindergartens and met with parents and administrators in order to carry out that strategy. Additionally, at various points throughout her tenure, plaintiff supervised the custodial staff, proposed budgets, and proposed teacher salaries.

The totality of the evidence in this case establishes that plaintiff exercised independent discretion, and that she was principal of the School in both title and function. This is not to say that Reverend Simpson did not exert his influence over plaintiff in a number of situations, or that plaintiff's discretion was not unfettered. But the duties of an exempt administrative employee need only *include* the exercise of discretion and independent judgment, and as her own statements demonstrate, plaintiff exercised such discretion with regularity. Moreover, the relative infrequency with which plaintiff and Reverend Simpson met or communicated with each other during plaintiff's tenure belies any suggestions that plaintiff was being micro-managed. Accordingly, defendants have demonstrated that no genuine issue of material fact precludes finding that plaintiff was an administrative employee exempted from FLSA's overtime provisions. Defendants' motion for summary judgment on this claim is granted.

C.    Plaintiff's COBRA and ERISA Claims

Plaintiff next claims that defendants violated her rights under COBRA by failing to notify her that her health insurance benefits had expired,[3] *see* 29 U.S.C. § 1166, and that they violated

---

[3] Plaintiff asserts for the first time in her summary judgment papers that defendants also violated state law by failing to notify her that her benefits had been terminated. *See* N.Y. Lab. Law § 195(6). Irrespective of the merits of this putative claim, plaintiff cannot amend her complaint by raising new claims in summary judgment papers, without

her rights under ERISA by failing to publish a summary description of Concord's employee pension plan, notify her of her eligibility to participate in the pension plan, and segregate assets for such a plan, *see* 29 U.S.C. §§ 1001 et seq.  In response, defendants argue that both Concord's health insurance and pension plans are "church plans," which are specifically exempted from the provisions of both ERISA and COBRA.  *See* 29 U.S.C. § 1003(b) (ERISA's benefits protection provisions "shall not apply to any employee benefit plan if—such plan is a church plan (as defined in section 1002(33) of this title) with respect to which no election has been made under section 410(d) of Title 26."); 26 C.F.R. § 54.4980B-2, Q-4(b)(2) ("All group health plans are subject to COBRA except . . . [,*inter alia*,] [c]hurch plans (within the meaning of section 414(e) [of the Internal Revenue Code])."); *see also* 26 U.S.C. § 4980B(d) (church plans, as defined by 26 U.S.C. § 414(e), are exempt from being taxed for failing to satisfy continuation coverage requirements.)

Both ERISA and the Internal Revenue Code define a "church plan" as "a plan established and maintained . . . for its employees . . . by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26."  29 U.S.C. § 1002(33)(A); 26 U.S.C. § 414(e)(1).  "A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches" is defined to include:

> [A] plan maintained by [a non-church] organization . . . the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

29 U.S.C § 1002(33)(C)(i); 26 U.S.C. § 414(e)(3)(A).  Moreover, "an employee of a church or a convention or association of churches" is considered to include an employee of a non-church

---

notice to defendants, after discovery has ended.  *See Davis v. City of New York*, 06-CV-3323, 2007 WL 2973695 at *3 (E.D.N.Y. Sept. 28, 2007) (collecting cases).

organization that is "controlled by or associated with a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(ii); 26 U.S.C. § 414(e)(3)(B). A church controls a non-church organization when, for example, it appoints a majority of that organization's officers or directors, and it is associated with that organization when the church and the organization share "common religious bonds and convictions." *Lown v. Continental Cas. Co.*, 238 F.3d 543, 547 (4th Cir. 2001) (citing 26 C.F.R. § 1.414(e)-1(d)(2)); 29 U.S.C. § 1002(33)(C)(iv)). *See also id.* at 548 (determining "association" by considering: "1) whether the religious institution plays any official role in the governance of the organization; 2) whether the organization receives assistance from the religious institution; and 3) whether a denominational requirement exists for any employee or patient/customer of the organization").

In this case, plaintiff, although she worked at the School, was employed directly by Concord, as the School was not a distinct legal entity. It is undisputed that Concord is incorporated as a religious organization under the laws of New York State, and is exempt from taxation under section 501(c)(3) of the Internal Revenue Code as part of ABC's group exemption. It is also undisputed that Concord established a health plan for its church employees with HIP, that plaintiff elected to participate in this plan, and that Concord maintained this plan by paying premiums on behalf of its employees, including plaintiff while she was employed as principal. As such, plaintiff was receiving health care coverage under "a plan established and maintained . . . for its employees . . . by a church . . . which is exempt from tax under section 501 of Title 26." 29 U.S.C. § 1002(33)(A); 26 U.S.C. § 414(e)(1). Accordingly, defendants had no obligation under COBRA to notify plaintiff that her healthcare benefits had expired.[4] The pension plan that Concord's ministers participated in also qualifies as a church plan. The

---

[4] The parties dispute whether plaintiff's health coverage continued after plaintiff was discharged on December 31, 2002. Because the court finds that Concord had no obligation to notify plaintiff even if her coverage was discontinued, the court expresses no opinion on what actually became of plaintiff's coverage after her termination.

pension plan was established and maintained by MMBB to provide for retired and disabled ministers and their families. MMBB is associated with a convention of churches, ABC, of which defendant Concord is a member. *See* 29 U.S.C § 1002(33)(C)(i); 26 U.S.C. § 414(e)(3)(A). MMBB's Director of Compliance submitted a sworn affidavit stating that MMBB has not elected to be subject to ERISA. *See* 29 U.S.C. § 1003(b). Plaintiff has failed to point to any facts that controvert defendants' evidence that both Concord's health insurance and pension plans were "church plans" exempted from the provisions of COBRA and ERISA. As such, no genuine issues of material fact exist, and plaintiff's claims under these statutes are dismissed.

Finally, plaintiff assert that defendants cannot now claim the "church plan" defense to plaintiff's COBRA and ERISA claims because it constitutes an affirmative defense that was not raised in their answer to plaintiff's complaint. Rule 8(c) of the Federal Rules of Civil Procedure provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c).[5] Affirmative defenses presented for the first time in dismissal and summary judgment motions, however, may be considered so long as plaintiff is not prejudiced by the delay. *See Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 283 (2d Cir. 2000) ("Although *res judicata* is an affirmative defense that should be raised in the defendant's answer, the district court has the discretion to entertain the defense when it is raised in a motion for summary judgment, by construing the motion as one to amend the defendant's answer.") (citing *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).

In the present case, defendants raised the "church plan" defense as a ground for dismissal in their Rule 12(b) motion. In denying that aspect of defendants' motion, the court specifically

---

[5] This language reflects the recent amendments to the Federal Rules of Civil Procedure that went into effect on December 1, 2007. At the time defendants filed their answer, Rule 8(c) read: "In pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense." Fed. R. Civ. P. 8(c) (1987) (amended 2007). The court uses the current language, however, because the 2007 changes "are intended to be stylistic only." Fed. R. Civ. P. 8 (advisory committee's notes to 2007 amendment).

stated that it retained jurisdiction to decide whether "[Concord]'s health plan and pension plan . . . are 'church' plans." *Coleman-Edwards*, 2005 WL 2367628 at *1. Plaintiff was well aware that plaintiff was relying upon this defense, and cannot now claim that she has suffered prejudice as a result. Moreover, the church plan defense goes to the court's jurisdiction to consider plaintiff's claim, and, thus, may be considered by the court *sua sponte*. *See Lown*, 238 F.3d at 547 ("If the disability plan was a church plan, no federal question would exist because the plan would not be covered by ERISA."); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Accordingly, defendants' failure to raise the "church plan" defense in their answer does not preclude the court from considering it on the present motion.

## III.  Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and plaintiff's claims under FLSA, COBRA, and ERISA are dismissed with prejudice.

SO ORDERED.

DATED:      Brooklyn, New York
                March 25, 2008


_____/s/_____

                                DORA L. IRIZARRY
                          United States District Judge